IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


VINCENT ALLEN WEST,

      Plaintiff,


v.                                      Case No. 2:13-4817


JAMES RUBENSTEIN, Commissioner
of Corrections, DAVID BALLARD, Warden,
Mount Olive Correctional Complex,
CAPTAIN PHILLIP MATHENY,
Former Sgt. JEFFREY HILEWITZ,
CO I ROBERT BLETHINS, each in his
individual and official capacity, and
WEXFORD HEALTH SOURCES, INC.,

      Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>


      Pending are a motion to dismiss filed August 21, 2013, by defendants Commissioner of Corrections James Rubenstein, Warden David Ballard, Captain Phillip Matheny and CO II Robert Blethins ("the DOC defendants"), and a motion to dismiss, or in the alternative, for summary judgment, filed the same day by defendant Wexford Health Sources, Inc. ("Wexford"), and a joinder by Sergeant Jeffrey Hilewitz in the DOC defendants' motion to dismiss, filed March 25, 2014.  The court withdraws the April 15, 2013, reference in this matter.

I.

A.   Introduction

Plaintiff Vincent Allen West is incarcerated at Mount Olive Correctional Complex ("MOCC").  This litigation arises out of an assault he suffered at the hands of fellow inmate Jacob Samples.  The attack occurred in the recreation yard of the MOCC Quilliams I segregation unit.  Mr. West alleges the motivation was his prior conviction, which involved an offense against a minor.

Mr. West alleges three claims.  First, he asserts that the DOC defendants infringed his Eighth Amendment rights in failing to prevent the assault.  Second, he accuses Commissioner Rubenstein and Warden Ballard of failing to implement adequate procedures to guarantee inmate safety.  Third, he charges Wexford with providing him inadequate medical care following the attack.  The factual allegations supporting these claims follow.

B.   The December 24, 2012, Assault

On December 24, 2012, two correctional officers delivered Mr. West and Mr. Samples to the Quilliams I recreation

2

area.  Mr. Samples is alleged to be a known "Hate Crime

activist."  (Sec. Am. Compl. ¶¶ 1-2).  Just days prior, he

brutally assaulted Jason Anderson, another inmate previously

convicted of an offense involving a minor.[1]  CO II Blethins

served as the control officer on December 24, 2012.  He

permitted the correctional officers to place Mr. West in the

recreation area with Mr. Samples.  Soon after his arrival, Mr.

Samples confronted Mr. West.  Mr. Samples asked Mr. West a

question.  When Mr. West turned to answer, Samples brutally

assaulted him and knocked him to the ground.

Mr. Samples struck Mr. West repeatedly in the face

around the jaw, eyes, and head.  He then dislocated the forearm

and kicked him in the head.  CO II Blethins remained in the

control area.  Mr. West contends that the attack resulted in a

dislocated left elbow, a dislodged bone chip, two black eyes,

multiple contusions, and head swelling.  He suffered pain,

dizziness, and headaches that recur, along with arm and left

hand numbness that produces pain and causes challenges in

---

[1] Mr. West provides further detail about Mr. Samples in an
affidavit.  He notes that, after the attack, Mr. Samples
assaulted still others in the recreation area before Sergeant
Hilewitz left MOCC.  Based upon these and other events he
identifies, Mr. West does not believe that the officials in
charge of MOCC are capable of providing a safe environment.  He
states his desire to speak to federal law enforcement officials
about the atmosphere he perceives at MOCC.

performing daily tasks.  He fears further assaults and complains that his quality of life has diminished.

Mr. West contends that he was removed from the area by correctional officers while Mr. Samples uttered a "'Hate Crime' statement regarding baby rapers."  (Id. ¶ 5).  He was taken to, and x-rayed at, the medical unit.  He was subsequently transported to Charleston Area Medical Center ("CAMC").  Another x-ray was taken there and his dislocated left arm was repositioned.

Mr. West asserts that his treating physician, and another doctor at CAMC, ordered a follow up with an orthopedist. He spent the night in the MOCC infirmary.  On December 25, 2012, he was returned to the segregation unit.  The next day he was released to the general population.  He claims to have submitted a grievance to Unit Manager William Kincaid.  He provides no detail respecting what the grievance concerned.


C.   Mr. West's Claims and the Motion Practice


Mr. West accuses Commissioner Rubenstein of failing "to instruct his subordinates and provide adequate procedures for handling of 'Hate Crimes' inmates and failing to instruct and provide procedures for the specific separate housing of

dangerous and combative inmates in the West Virginia Division of Corrections segregation facilities." (<u>Id.</u> ¶ 8).  He further alleges that Commissioner Rubenstein, "as Respondeat Superior, failed to draft and implement adequate and specific procedures for the segregation and separation of malicious 'Hate Crime' individuals in a Gang reference and failed to protect this Plaintiff accordingly." (<u>Id.</u> ¶ 9).  Warden Ballard faces similar allegations.  (<u>Id.</u> ¶ 11).

Mr. West also contends that Captain Matheny, CO II Blethins, and Sergeant Hilewitz allowed him to be in the company of Mr. Samples despite his and his "Hate Gang['s]" reputation for assaulting those accused of crimes against minors.  (<u>Id.</u> ¶ 10).  He asserts that the failure to protect him was "incompetent and irresponsible" and also a "willful violation of" the Eighth Amendment. (<u>Id.</u>)

He specifically alleges the following actionable conduct on the part of each of these correctional officers:

> That CO II Blethins failed to protect him given his role of controlling the movement of prisoners into and out of the recreation area;

> That Sergeant Hilewitz, who was tasked with supervisory responsibilities in Quilliams, "orchestrated and arranged the systematic assaults of sex offenders through collaboration with inmate Jacob Samples resulting in the assault on this Plaintiff and three others with sex offenses . . . ." (<u>Id.</u> ¶ 13).

That Captain Metheny as the "ranking supervisor of the Quilliams unit, . . . failed to pass along information regarding the types of persons Samples would and had preyed upon and this placed the plaintiff in danger of assault." (Id., ¶ 15). He additionally accuses Captain Matheny of failing to make or implement the decision to place Mr. Samples on single recreation to ensure the safety of other inmates in the segregation unit. That occurred in the months following December 24, 2012.

Respecting Wexford, Mr. West alleges it failed to provide follow-up examination and treatment by an orthopedist for the bone chip and fracture found on the CAMC x-ray. He alleges that this conduct was "incompetent" and a "direct denial of treatment of a serious medical need." (Id. ¶ 17). He also contends he has suffered the denial of appropriate mental health treatment for trauma and anxiety following the assault event.

Mr. West seeks damages and injunctive relief. He is presently incarcerated at the Northern Correctional Facility ("NCF"), in Moundsville. As a result, his injunctive relief requests arising out of his treatment and conditions of confinement at MOCC are now moot. See Rendellman v. Rouse, 569 F.3d 182, 186 (4th Cir. 2009) (stating "[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there.")

6

On August 21, 2013, Wexford moved to dismiss or, in the alternative, for summary judgment.  That same day Commissioner Rubenstein, Warden Ballard, and Captain Matheny moved to dismiss.  Following service of process, CO II Blethins joined therein.  The briefing on the motions is complete.

II.

A.  Governing Standards

Both the Rule 12(b)(6) and Rule 56 standards require discussion.  First, Rule 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing . . . entitle[ment] to relief."  Fed. R. Civ. P. 8(a)(2); <u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200 (2007).  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted . . . ."  Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1964 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957), <u>overruled on other grounds</u>, <u>Twombly</u>, 127 S. Ct. at

7

1969)); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007). Additionally, the showing of an "entitlement to relief" amounts to "more than labels and conclusions . . . ." Twombly, 127 S. Ct. at 1965. It is now settled that "a formulaic recitation of the elements of a cause of action will not do." Id.; Giarratano v. Johnson, 521 F.3d 298, 304 (4th Cir. 2008).

The complaint must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 127 S. Ct. at 1974; Giarratano, 521 F.3d at 302. The recent decision in Iqbal provides some guidance concerning the plausibility requirement:

> A claim has facial plausibility when the plaintiff
> pleads factual content that allows the court to draw
> the reasonable inference that the defendant is liable
> for the misconduct alleged. The plausibility standard
> is not akin to a "probability requirement," but it
> asks for more than a sheer possibility that a
> defendant has acted unlawfully. Where a complaint
> pleads facts that are "merely consistent with" a
> defendant's liability, it "stops short of the line
> between possibility and plausibility of 'entitlement
> to relief.'"

Iqbal, 129 S. Ct. at 1949-50 (citations omitted).

As noted in Iqbal, the Supreme Court has consistently interpreted the Rule 12(b)(6) standard to require a district court to "'accept as true all of the factual allegations contained in the complaint . . . .'" Erickson, 127 S. Ct. at

8

2200 (quoting <u>Twombly</u>, 127 S. Ct. at 1965); <u>see also</u> <u>South Carolina Dept. of Health and Environmental Control v. Commerce and Industry Ins. Co.</u>, 372 F.3d 245, 255 (4th Cir. 2004) (quoting <u>Franks v. Ross</u>, 313 F.3d 184, 192 (4th Cir. 2002)). The court is additionally required to "draw[] all reasonable . . . inferences from those facts in the plaintiff's favor . . . ." <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 244 (4th Cir. 1999).

Respecting summary judgment, a movant will prevail "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

B. The Law Governing the Claims and the Analysis

1. DOC Defendants' Motion to Dismiss

In <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994), the Supreme Court noted that the Eighth Amendment "imposes duties on [prison] officials who must provide humane conditions of

confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  It emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" Id. at 833.

That explains, in part, the high standard governing Eighth Amendment claims.  To prevail, an inmate must show: (1) "the deprivation . . . [is] objectively, 'sufficiently serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official had a "'sufficiently culpable state of mind;'" that is, "'deliberate indifference' to inmate health or safety." Id. at 834. (citations omitted.).

Lest there be any doubt respecting the subjective component found in the second element above, the Supreme Court additionally stated as follows:

> We hold . . . that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id. at 837 (emphasis added). The negligent failure to protect inmates from violence will not suffice. Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987).

The DOC defendants contend Mr. West has offered only conclusory assertions without any factual support. They note that a claim should be dismissed if it is merely conceivable and fails to cross the line between possibility and plausibility. They also assert entitlement to the defense of qualified immunity, stating that no reasonable officer or official under the circumstances would have believed that his or her conduct violated clearly established law. See Pearson v. Callahan, 555 U.S. 223 (2009) (discussing the discretionary sequencing of the two-part qualified immunity assessment, namely, whether a constitutional right was violated and, if so, whether it was clearly established at the time of the deprivation).

In response, Mr. West principally notes that the "the [DOC] [d]efendants each had actual knowledge of inmate Samples['] illegal and criminal acts of assault upon inmates who were convicted of sexual assault, based upon the fact inmate Samples has assaulted other inmates, and they failed to take corrective action to prevent him from assaulting other inmates." (Resp. at 3).

11

He adds that WVDOC records show that Mr. Samples had a history of at least two prior assaults on inmates due to their sexual preferences or their crimes of conviction, namely, Jason Anderson and an unidentified individual.  He alleges that Mr. Samples' beliefs and violent acts were well known to the DOC defendants, yet they failed to put in place practices or policies to prevent him from engaging in inmate violence.  At bottom, he contends that this "is not a case where it was a one time situation that an inmate assaulted another inmate.  This is a case that inmate Samples was a known violent offender that committed hate crimes against certain inmates."  (Id. at 11).

It is noteworthy that, prior to the assault, Mr. West did not cite any particular threat from, or concern about, Mr. Samples.  His general assertions that the DOC defendants knew or should have known of the violent history or reputation of Mr. Samples, and the possibility that he might harm an inmate who was convicted of a sexual offense or other offense involving a minor, are insufficient to establish liability under the Eighth Amendment on a failure-to-protect theory.

It is well-established that in order to successfully assert such a claim, a plaintiff must be able to demonstrate that each individual defendant was actually and subjectively aware of a specific risk of harm to the plaintiff from the

12

inmate involved and that the substantial risk was ignored by that defendant.  Mr. West's allegations relating to two prior assaults, one upon an identified individual and the other upon an individual whom he fails to identify, fall short of that mark.  His operative pleading is littered instead with speculation and conjecture on those points.  He has neither pled the deprivation of his Eighth Amendment rights nor a violation of clearly established law.

The court, accordingly, ORDERS that the DOC defendants' motion to dismiss be, and hereby is, granted.

### 2. Wexford's Alternative Motion for Summary Judgment

"In order to state a cognizable claim for denial of medical care under the Eighth Amendment, an inmate must allege facts sufficient to demonstrate a deliberate indifference to a serious medical need." Estelle v. Gamble, 429 U.S. 97, 104 (1976); United States v. Clawson, 650 F.3d 530, 537 (4th Cir. 2011).  "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to

13

fundamental fairness."  Miltier v. Beorn, 896 F.2d 848, 851 (4th
Cir. 1990).

In Farmer, the Supreme Court observed as follows
concerning this branch of an inmate's Eighth Amendment rights:

> In considering the inmate's claim in Estelle that
> inadequate prison medical care violated the Cruel and
> Unusual Punishments Clause, we distinguished
> "deliberate indifference to serious medical needs of
> prisoners," from "negligen[ce] in diagnosing or
> treating a medical condition," holding that only the
> former violates the Clause. We have since read Estelle
> for the proposition that Eighth Amendment liability
> requires "more than ordinary lack of due care for the
> prisoner's interests or safety."

Farmer, 511 U.S. at 835.

As our court of appeals recently observed, however, an
inmate's allegation that he is receiving inadequate care to
treat his medical needs may support a claim of deliberate
indifference.  De'lonta v. Johnson, 708 F.3d 520, 526 (4th
Cir.2013) (While "a prisoner does not enjoy a constitutional
right to the treatment of his or her choice, the treatment a
prison facility does provide must nevertheless be adequate to
address the prisoner's serious medical need.").  It is not
enough though that the inmate asserts nothing more than a
disagreement with his diagnosis or prescribed treatment.  Wright
v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Russell v.
Sheffer, 528 F.2d 318, 319 (4th Cir. 1975).  An inmate is not

14

entitled to unqualified access to health care, and treatment may be limited to what is medically necessary and not "that which may be considered merely desirable" to the inmate.  <u>Bowring v. Godwin</u>, 551 F.2d 44, 47-48 (4th Cir. 1977).

At the same time, correctional facility physicians transgress the Eighth Amendment if they decline to provide the level of care they deem medically necessary or fail to adequately address a prisoner's complaints that the care he is receiving is not effective.  <u>See</u> <u>Miltier v. Beorn</u>, 896 F.2d 848, 853 (4th Cir.1990) (treating physician may be deliberately indifferent where he fails to provide level of care he believes is necessary); <u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir.1986) (failure to respond to an inmate's known medical needs raises an inference of deliberate indifference to those needs).

At bottom, the burden of demonstrating deliberate indifference to a serious medical need is very high, as noted in <u>Iko</u>:

> [T]here is a subjective and an objective component to showing a violation of the right. The plaintiff must demonstrate that the officers acted with "deliberate indifference" (subjective) to the inmate's "serious medical needs" (objective).
>
> Beginning with the objective component, a "serious ... medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." . .

.

> Plaintiffs must also show the subjective
> component -- deliberate indifference. An officer is
> deliberately indifferent only when he "knows of and
> disregards" the risk posed by the serious medical
> needs of the inmate.  The subjective component
> therefore <u>sets a particularly high bar to recovery</u>.

<u>Iko</u>, 535 F.3d at 241 (citations omitted).

For example, in <u>Webster v. Jones</u>, 554 F.2d 1285 (4th Cir. 1977), the plaintiff complained numerous times of eye problems and loss of vision.  He asserted that he was cursorily examined after his initial complaint but never re-examined despite later complaints.  A specialist subsequently found that Webster's vision had deteriorated to 20/400, that he suffered from a detached retina and iritis, and that his vision could not be restored.  Nevertheless, the court of appeals concluded that, assuming the doctor had been negligent in failing to properly diagnose or treat Webster, negligence is insufficient to demonstrate deliberate indifference to a serious medical need. Webster's allegations thus fell short of the Eighth Amendment bar.  <u>See also</u>, <u>Johnson v. Quinones</u>, 145 F.3d 164, 168 (4th Cir. 1998).[2]

--------

[2]  Wexford notes that any traditional medical malpractice claim asserted by Mr. West is also barred.  He has neglected the pre-requisites of the West Virginia Medical Professional Liability Act ("MPLA"), § 55-7B-6.  The MPLA requires pre-suit notice of a claim and a screening certificate of merit from a qualified expert health care provider indicating that a

Wexford notes Mr. West's accusation that it failed to provide a follow-up examination and treatment by an orthopedist for the bone chip and fracture.  Wexford first observes that Mr. West's characterization of his discharge instructions is inaccurate.  Specifically, no box was checked in the section titled "Call to arrange follow-up."  The instructions were instead to provide Motrin 800mg every six hours, furnish a sling, keep the dressing clean and dry, elevate as much as possible, and provide ice for 20 minutes, 6-8 times per day.  The only reference to follow-up appointments was listed in the "Other Comments" section, which stated, "Return to ER if symptoms worsen or if new concerns."[3]

Wexford additionally notes the treatment history.  First, it took steps to treat Mr. West prior to his transport to CAMC.  For example, the first entry in his medical records on December 24, 2012, indicates that Mr. West complained of severe pain in, and the inability to move, his left elbow.  Wexford notes that the entry states to "follow hospital staff's

_____

defendant's conduct violated the applicable standard of care, which resulted in injury to the plaintiff.  See, e.g., Boggs v. Camden-Clark Memorial Hosp. Corp., 609 S.E.2d 917 (W. Va. 2004).

[3] The discharge instructions, in a section entitled "CALL TO ARRANGE FOLLOW-UP," lists this: "Dr. Sop 388-7100 — call 12-26 am."  (Dischg. Ins. at 1).  It is uncertain whether Mr. West was expected to call Dr. Sop regardless or only if symptoms worsened or new concerns arose.

instructions; submit NSC [Nurse Sick Call] slip." (Wexford Prog. Notes at 1).  Second, Wexford points out that, upon his return to MOCC, Mr. West received multiple follow-up visits, with examinations by a Wexford physician who provided appropriate continuing care in accordance with CAMC emergency room personnel.

Mr. West responds and notes that portion of the discharge instruction providing contact information for Dr. Sop with a date of "12/26 a.m." ("discharge instruction").  He also provided additional medical records with his responses to the defendants' motions.  One such document is a summary of the treatment rendered by Dr. Edward E. Wright, M.D., one of his treating physicians at CAMC ("summary of treatment").  The discharge plan at the bottom of this summary directs that Mr. West have a "follow-up with Dr. Sop," and "call for appointment."  Mr. West additionally notes as follows:

> The Plaintiff still has an injured elbow that will need medical surgery to remove the spurs, this is to the best of his knowledge and belief, as he is experiencing pain and still has a week [sic; weak] left arm because of the injury sustained from the assault.  The facts show actual injury, and without another Doctor['s] opinion, the Plaintiff is without knowledge as to extent he will be able to obtain full use of his left arm without pain and weakness.

(Pl.'s Resp. at 2).  He also contends that, without discovery, he "does not know who is responsible for not returning him in a timely manner to the CAMC."  (Id. at 3).

Wexford notes in reply that Mr. West is ineligible for the injunctive command of surgery inasmuch as he is no longer incarcerated at MOCC.  It also emphasizes that he complains merely of a disagreement respecting the appropriate course of treatment.

Having considered the materials presented, it appears Mr. West received treatment for a dislocated elbow following the assault by inmate Samples.  He was transported promptly to CAMC, where he received both diagnostic testing and treatment.  The failure to follow up with Dr. Sop does not support an Eighth Amendment claim.  Respecting the discharge instruction, its equivocal nature, in the form of a brief chart entry, does little to satisfy the subjective component.  The same is true of the summary of treatment from Dr. Wright.

It is evident that Wexford physicians deemed the necessary follow-up within their expertise.  Wexford physician orders found in the record reflect that Mr. West was seen on three separate occasions by Wexford medical personnel following his release from CAMC.  Those assessments occurred on December

19

28, 2012, January 8, 2013, and January 11, 2013.  There was thus an established course of evaluation and treatment.

Mr. West is not entitled under binding precedent to demand that the opinion of his emergency room physician be permitted to override the reasonable professional judgment of the MOCC physician(s) who thereafter examined him multiple times.  Cf. Clawson, 650 F.3d at 538 (noting that an inmate is entitled to necessary medical treatment, but he does not enjoy "a right to demand that the opinion of his pre-imprisonment doctor be permitted to override the reasonable professional judgment of the prison's medical team.").

In sum, the claim against Wexford alleges little more than a disagreement with the course and timing of his treatment.  Treating his allegations as true, Mr. West has not alleged a plausible Eighth Amendment claim that Wexford or its employees acted with deliberate indifference to his serious medical needs. Inasmuch as there is no genuine issue of material fact, Wexford is entitled to judgment as a matter of law on the Eighth Amendment claim alleged against it.  It is, accordingly, ORDERED that Wexford's motion for summary judgment be, and it hereby is, granted.

III.


Based upon the foregoing discussion, it is ORDERED as follows:


1.   That the WVDOC defendants' motion to dismiss, as joined by Sergeant Hilewitz, be, and it hereby is, granted;


2.   That Wexford's motion for summary judgment be, and hereby is, granted; and


3.   That this action be, and hereby is, dismissed and stricken from the docket.


The Clerk is directed to transmit a copy of this written opinion and order to counsel of record and Mr. West.

DATE:  March 31, 2014

John T. Copenhaver, Jr.
United States District Judge

21